**UNITED STATES of America**

v.

**The BARGE CBC 603, etc., and Canal Barge Company of New Orleans, Louisiana.**

**No. AD 3418 Div. B.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Aug. 25, 1964.

Louis R. Lucas, Kathleen Ruddell, L. Howard McCurdy, Asst. U. S. Attys., New Orleans, La., and Alan Raywid, U. S. Department of Justice, Admiralty & Shipping Section, Washington, D. C., for libellant.

George Denegre, Robert B. Acomb, Jr., Edmond C. Salassi, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for respondent.

FRANK B. ELLIS, District Judge.

During the night of September 25, 1956, respondent's unmanned vessel, the Barge CBC 603, broke its mooring line and drifted down the Chattahoochee River until it collided with an Army pontoon bridge which spanned the river at Bradley's Landing, Fort Benning, Georgia.

The United States, as owner of the bridge, instituted an action for damages to the bridge, and in an amended libel, claimed salvage for the recovery of respondent's barge. The claims are directed against the Barge CBC 603, *in rem*, and against its owner, Joseph M. Jones, *in personam*.[1] Respondent seeks to avoid liability on the grounds of inevitable accident or "force majeure." The barge CBC 603 was bareboat chartered at the time of the accident to Mr. Thurston Crawford of Columbus, Georgia, who was then engaged in the towing business.

In July of 1956 the barge was loaded at Columbus, Georgia, with a cargo of approximately one hundred tons of rock to be towed downstream for use in a construction project. Due to the low level of water in the Chattahoochee River at that time of year, the barge ran aground approximately seven miles north of libellant's pontoon bridge. The charterer, upon realizing that a continued attempt to free the grounded barge would be to no avail, directed his employees to secure the stranded vessel by attaching one end of a manila line two or two and a half inches in diameter, to a cleat on the barge while securing the other end to a tree trunk on the bank. Once attached, the line extended approximately one hundred and fifty to two hundred feet from the tree to the barge.

The barge remained in this grounded position for approximately two and a half months. Meanwhile, on or about September 21, 1956, Hurricane Flossy formed in the Gulf of Mexico near the Yucatan Peninsula. On the 23rd of September, the storm reached its maximum intensity at sea somewhat to the south of the Louisiana coast. On the 24th, it hit the mainland in the vicinity of Pensacola, Florida, after having curved to the northeast. Eventually, Hurricane Flossy dropped below hurricane intensity, and on the 25th, while crossing in a northeasterly direction through the southern part of Georgia, the storm became classified as an "extra-tropical cyclone." Although the storm did not pass in the immediate vicinity of Fort Benning, Ga., it did produce heavy rains totalling 5.8 inches and winds up to 20 knots in that area. The intensity of the rainfall caused a flooding condition in the upper part of the Chattahoochee River which necessitated an opening of the gates at the Bartlett's Ferry Dam located above Columbus, Ga. This resulted in a 12-foot rise of the waters below the dam which, in turn, caused the Barge CBC 603 to refloat. Eventually, the line securing the barge to the tree trunk on shore became inadequate to hold the barge and its heavy cargo against the onrush of the rising river.

Meanwhile, at Bradley's Landing, soldiers were attempting to raise the bridge and to move floating debris through and under the pontoon bridge. After a lookout had cited what then appeared to be a very large object floating towards the bridge, a warning was issued and the bridge was cleared of all personnel. Shortly thereafter, at approximately 10:30 p. m., the barge struck the bridge with considerable impact. The soldiers at the site were first ordered to secure the damaged bridge, and later they attempted to remove the barge from its contact with the bridge. This was to be accomplished by attaching cables from the barge to winch-equipped trucks on the east bank of the river. However, a successful removal of the barge was rendered impossible due to a lack of sufficient traction on the rain-soaked earth where the trucks were located. Eventually, the weakened bridge, with the barge continually pressing against it, gave way and broke into several parts which then floated away. The barge which had already been secured by cables attached to the winch trucks came to rest alongside the east bank of the river.

Respondents have raised the defense of inevitable accident. In addition to showing the presence of a "force

1. In the amended libel, Joseph M. Jones was substituted for Canal Barge Company of New Orleans, La., as the proper owner of the Barge CBC 603.

majeure", one who asserts this defense also has the burden of clearly establishing his freedom from fault before he can be exonerated from payment for damages to the property of an innocent third party. Sherwood Refining Co., Inc. v. Whiteman, 127 F.Supp. 478 (E.D.La. 1955). In such a case, freedom from fault is generally determined by the reasonableness of the precautions taken under the circumstances as known *or reasonably to be anticipated.* Swenson v. The Argonaut, 204 F.2d 636 (3 Cir. 1953); see also Gilmore and Black, The Law of Admiralty (3rd Ed. 1957) at p. 398.

It is thus incumbent upon respondent in this case to show that the accident could not have been prevented even by the use of that degree of reasonable care and attention which the situation demanded. Moran Towing & Transportation Co. v. M/S Hoperange, 226 F.Supp. 1018 (E.D.La.1964); Boudoin v. J. Ray McDermott and Co., 281 F.2d 81 (5th Cir. 1960); The J. N. Gilbert, 222 F. 37, 41 (5th Cir. 1915).

■ Ordinarily, several hours are required for waters released by the dam to reach that area where the barge was located. Although the charterer of the barge, Mr. Crawford, was not directly informed that the dam was to be opened at any precise time, he nevertheless admitted his awareness of the unusual weather conditions and of the fact that, under the circumstances, the gates of the Bartlett's Ferry Dam would eventually have to be opened. (Transcript, pp. 93, 96.) It thus appears that the party in control of the moored vessel has failed to show that he made a critical evaluation of the circumstances and the reasonable courses of action which may have been taken under such circumstances. The defense of "force majeure" necessitated in this case a credible showing that the charterer had no reason to anticipate the possibility that the barge would have been rapidly refloated at that time which in turn would have required an immediate inspection of the mooring lines. On the contrary, the charterer, by reason of his knowledge of the area and of the conditions which ordinarily caused the dam to be opened, admitted to the Court his awareness of a foreseeable opening of the dam due to the prevailing climatic conditions. The only excuse offered for his failure to inspect the sufficiency of the mooring was his lack of certainty as to the precise moment the waters at the dam would probably be released. Under such circumstances, a lack of such precise knowledge does not mitigate the duty to exercise some precautionary measures, particularly that duty to inspect the security of an unattended, lightly-secured vessel, exposed to the foreseeable and forceful onrush of released flood waters. Such failure to inspect the mooring lines coupled with the absence of larger and stronger lines constitutes negligence.

■ Respondent further asserts that the alleged failure of libellant to immediately attempt a removal or securing of the barge prior to its breakthrough constituted an intervening cause and thereby became the proximate cause of the bridge's destruction. By raising such a defense, respondent assumed the burden of proving that an immediate removal or securing of the barge was possible at that time. Respondent has failed to sustain this burden. Libellant has shown that a removal of the barge was not feasible at that time due to an obstruction caused by the dislocated pontoons and the lack of sufficient traction on the bank. Furthermore, respondent has failed to offer any evidence showing the presence of equipment on the west bank of the river, or the possibility at that time of sending such equipment to the other side in order to secure the barge from both sides, and thereby relieve the barge's pressure against the already damaged bridge. The Court concludes that the libellant was not contributorily negligent.[2]

2. It is also the conclusion of this court that the Army pontoon bridge spanning the Chattahoochee River at Ft. Benning, Georgia, was not maintained in violation of any law.

Therefore, in the absence of showing that degree of reasonable care which the situation demanded in this case, the law attaches the consequences of liability for whatever damage was proximately caused by the failure of the party in control of the vessel to take reasonable precautions in the face of known conditions and foreseeable events.

■ Since the charterer of a vessel under bareboat charter is considered as the owner "pro hac vice" of the vessel, Rice v. New York Trap Rock Corp., 198 F.Supp. 346 (S.D.N.Y.1961), aff'd. 294 F.2d 272 (2d Cir. 1961), Gilmore and Black, The Law of Admiralty (3d Ed. 1957) at p. 218, the owner of the barge, Joseph M. Jones, is relieved from liability *in personam*. Such liability must in this case be borne by the charterer, Mr. Thurston Crawford, who was in lawful possession and control of the barge at the time of collision. Nevertheless the vessel itself remains liable *in rem* to those injured by the negligence of the party lawfully in control of the vessel at the time of the collision. Rice v. New York Trap Rock Corp., supra 198 F.Supp. at p. 351, and authorities cited therein.

■ Additionally, the libellant is entitled to some salvage award for having voluntarily rescued the Barge CBC 603 from a position of marine peril. The Impoco, 287 F. 400, 402, 1923 A.M.C. 82, 84 (S.D.N.Y.1922). Of the various factors and circumstances which are generally considered to determine the amount of the salvage award[3] in this case only the value of the property salved and the degree of danger from which the property was rescued are the major determinative factors. After the barge had struck libellant's bridge, it still remained out of control and in danger of eventually being swept downstream where other fixed structures were located which could have subjected the barge to additional unknown perils. However, other factors such as the labor expended by the salvors, the promptitude and skill displayed in rendering the service, and the risk incurred by the salvors to themselves and to the property used in the act of salvage do not merit substantial consideration in this particular case.

As requested and stipulated to by both parties, the Court at this time shall refrain from determining the amount of damages and the amount of the salvage award.

3. The "Blackwall formula", Gilmore and Black, The Law of Admiralty, (1957), p. 461.