Petition of **SHAVER TRANSPORTA-TION COMPANY,** for exoneration from or limitation of liability as the owner of the **BARGE ST–15.**

Civ. No. 66–456.

United States District Court
D. Oregon.

Dec. 13, 1967.

Kenneth E. Roberts, Mautz, Souther, Spaulding, Kinsey & Williamson, Portland, Or., for petitioner Shaver Transportation Co.

Floyd A. Fredrickson, Gray, Fredrickson & Heath, Portland, Or., for claimant Matson Navigation Co.

Bernard Jolles, Franklin, Olsen, Bennett, Des Brisay & Jolles, Portland, Or., for claimant Joseph W. Wiswell.

Frank Pozzi, Pozzi, Levin & Wilson, Portland, Or., for claimant Paul F. Jaschina.

## OPINION AND FINDINGS

KILKENNY, District Judge:

Shaver Transportation seeks exoneration from, or as an alternative limitation of, liability as outlined in 46 U.S.C. § 183(a).

Petitioner was the owner of Barge ST–15, which capsized on March 16, 1966, at Terminal 4 on the Willamette River. It is stipulated that the value of the barge, including equipment and pending freight, is $35,478.00. At the time of capsizing, the barge was in the custody of Matson Navigation Company (Matson), whose subsidiary, Matson Terminals, was loading containers onto the barge. Matson had custody of the barge under an agreement between it and Shaver whereby Matson hired the barge at a minimum rate of $50.00 per day. When Matson was not using the barge, it was returned to Shaver.

On the above date, at Matson's request, Shaver delivered the barge for loading by the stevedore, Matson Terminals. The containers, each weighing about twenty-five tons, were loaded on the barge by a crane. Two longshoremen, the claimants Wiswell and Jaschina, were working on the barge.

The barge was loaded from the east (aft) to the west. Each container extended the full width of the barge. Sixteen containers formed a layer. When the thirty-first container was loaded, the barge leaned to the outside and then rolled to the inside and capsized. The two longshoremen suffered severe injuries.

Matson and Matson Terminals concede negligence in loading the barge, but contend that pre-existing unseaworthiness of the barge was a contributing cause of the accident.

(1) The first issue the Court must explore and decide is the cause of the capsizing. Matson and the stevedore urge that the fore and aft compartments of the barge contained an excessive amount of water which affected the stability of the vessel and contributed to the disaster. The longshoremen working on the barge testified that after the first layer of containers was loaded, they noticed that the barge had a list and that some water was lapping over the southeast corner. The walking boss testified that he saw water break over the southeast corner of the barge. Matson and the stevedore attempt to buttress these contentions by evidence that after the barge was again righted, the aft rake manhole was opened and it was discovered to be half full of water (three to four and one-half feet).

However, it is my finding that the preponderance of the evidence supports Shaver's position that no excess water was present in the barge when delivered to Matson. Numerous checks had been made on the barge prior to the accident, the latest being in December, 1965, and no more than an inch of water was ever found. Such an amount is always present due to condensation and does not necessitate the use of pumps. American Cement Corp. v. Healy Tibbitts Constr. Co., 249 F.Supp. 891 (S.D.Cal.1966), aff'd. 371 F.2d 525 (9th Cir. 1967). The captain of the tug which towed the barge to the terminal on March 16th, testified that the barge was on even keel, and that this was true after the casualty, even though the barge was then upside down. This is quite clear cut evidence that there was no excessive amount in the fore or aft rake, even after the capsize. At the time of the trial, I made a note to the effect that I was impressed with the testimony of the captain, while I was not at all impressed with the testimony of the witness who claimed there was three to four and one-half feet of water in the aft rake when he made a rather superficial examination some considerable time after the incident. In any event, the fact that an excessive amount of water might have

been found at that time is rather weak evidence that the barge contained excess water on March 16th. It suffered substantial damage and there was evidence to the effect that holes were found in the deck which would permit the passage of water into the aft rake, while the barge was upside down.

The vans were not of equal weight and the poundage within them was not equally distributed. It is small wonder that the vessel capsized while carrying on her deck thirty-one vans with a gross weight of 710 short tons, when the weight limit, of which Matson and the stevedore were clearly advised, was 640 short tons. Not to be forgotten, is the established fact that the loading of two layers of these heavy vans on the flat deck of the barge, would move its center of gravity to a very dangerous height.

To me, as the trier of the facts, it seems incredible that the longshoremen would casually commence loading the barge with a known unstable cargo, if they had observed an obvious list. The evidence, and the inferences to be drawn therefrom, support a finding that the vans were first loaded on the stern and that it was the method of loading, rather than excess water in a rake, which caused her aft to list to the port side, thus creating an instability and an unseaworthy condition. In no other way can I give credence to the testimony, which I believe, of the witnesses who testified that the barge was riding evenly before the loading operation commenced. I have no difficulty in reconciling this finding with the admitted fact that, on at least one prior occasion, the employees of Shaver were called to the scene to take a look at an unusual listing of the barge during loading. Those inspectors, however, could find absolutely nothing wrong with the barge and arrived at the conclusion that it was an uneven distribution of the load on the barge which caused the list. Not to be overlooked is the fact that the photographs in evidence clearly demonstrate that the vessel was on an even keel after she capsized. One of the witnesses testified that it main-

tained this even keel to a time just immediately prior to the righting. It was his opinion, and also mine, that if there had been three feet of water in the aft rake, there would have been a list to the barge at that end. The evidence supports a finding that the barge compartments were periodically inspected by an experienced superintendent and that at no time had there ever been complaints of a listing by the Shaver tug boat skippers. The amount of water found in the barge, by Matson's own marine surveyor, would not affect the stability of the barge and this is admitted by Matson's own proctor. Furthermore, he concedes that the amount of water thus found would not make the vessel unseaworthy. There is no evidence to support Matson's contention that the barge had a *leak in her hull structure* above the light water line, which allowed the flooding of the rake while she was being loaded. Again, I mention that the testimony of Mr. Leitz, on whom Matson relies, is not worthy of serious consideration. If he had found three or four feet of water in the aft rake, he most certainly would have forthwith reported this observation. I questioned him on his failure to make an immediate report and his answers were quite unsatisfactory. In any event, the great weight of credible testimony supports my finding that there was not sufficient water in the rake, or for that matter in a compartment, to make the vessel unseaworthy, nor did she have a crack in her hull structure which allowed water to enter.

Petitioner had the burden of proving that the vessel was seaworthy at the time it was delivered to Matson on March 16, 1966. Petition of Cullen Fuel Co., Inc., 62 F.2d 68 (2d Cir. 1932); Grillea v. United States, 229 F.2d 687 (2d Cir. 1956). I find that the great weight of substantial evidence supports a finding that the barge was seaworthy at the time of delivery to Matson on March 16th.

(2) The next question presented is whether the oral charter agreement on the use of the barge between Shaver and

Matson amounted to a demise of the vessel. The evidence is undisputed that petitioner chartered the barge to Matson on March 16, 1966, pursuant to the terms of an oral contract made in January, 1964. The contract provided that Matson would pay a fixed daily rate of $50.00 per day and that Matson would outfit the barge for the loading of its containers. Petitioner was free to use the barge whenever the same was not in use by Matson. The purpose of the charter was to provide a lighter for Matson to transport its cargo from the dock at Terminal 4 to its container vessels. The containers aboard the barge, at the time of the casualty, were owned by Matson and they contained cargo being shipped by Matson as a carrier aboard its container vessel SS HAWAIIAN CITIZEN. Under the facts before me, I have no problem in finding that the oral charter of this non-powered vessel constituted a demise. Such oral charters are not uncommon. Barges Albany Sears & Syracuse Sears, 1966 AMC 1728 (S.D.N.Y. June 28, 1966); McGeeney v. Moran Towing, 149 F.2d 791 (2d Cir. 1945); American Cement Co. v. Healy Tibbitts Constr. Co., supra; The Doyle, 105 F.2d 113 (3d Cir. 1939). The evidence explicitly demonstrates that petitioner, at the time of the occurrence, had completely and exclusively relinquished possession, command and navigational control to the demisee, Matson. Whether Matson had completely relinquished possession, command and navigational control to its stevedore, Matson Terminals, in my opinion, is of no significance. If a finding was required, I would hold that Matson Terminals had possession, command and navigational control of the vessel at the time of the casualty, under its contract with Matson.

(3) The above findings require my views and decision on the legal issue which was sidetracked for future action in Guzman v. Pichirilo, 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962), and

Reed v. SS YAKA, 373 U.S. 410, 412, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963), rehearing denied 375 U.S. 872, 84 S.Ct. 27, 11 L.Ed.2d 101 (1963). Simply stated, that issue is whether a ship, on facts such as here found, may be held liable for its unseaworthiness where no personal liability can be asserted against the owner.

Justice Learned Hand, in at least two decisions,[1] had no difficulty in holding that liability would attach only if the ship was unseaworthy at the time it was delivered to the demisee. On rehearing in *Grillea*,[2] Justice Hand, without analysis and without in any way criticizing his previous decisions, used the following language:

"That does not indeed answer the question whether a maritime lien can be imposed upon a ship for a claim on which no jural person is liable 'in personam.' * * * So far as we have found, this is a question that has never come up in the books, although as *res integra*, we see no reason why a person's property *should never* be liable unless he or someone else is liable 'in personam.'" (Pages 923–924, Emphasis supplied.)

Personally, I have great difficulty in reconciling the language in the first *Grillea*, with that used by Justice Hand in the second. It seems to me that the precise question was decided in the first and that the Justice did not intend to destroy the effect of that language when he said: " * * * we see no reason why a person's property should never be liable unless he or someone else is liable 'in personam.'" After a thorough analysis of both opinions, I am convinced that the decision in the second was controlled by the clause in the indemnity agreement to which the Justice attached great weight. Certainly, what was said on the subject in the second *Grillea* is little more than dictum. After making the above

1. Cannella v. Lykes Bros. S. S. Co., 174 F.2d 794 (2d Cir. 1949); Grillea v. United States, 229 F.2d 687 (2d Cir. 1956).

2. Grillea v. United States, 232 F.2d 919 (2d Cir. 1956).

statement, the author shrugs it off with the language, "Be that as it may, * * *." [3] The remainder of the opinion concerns itself only with the effect of the indemnity clause in the charter. Neither *Cannella* nor the first *Grillea* is, in my opinion, overruled or modified by *Grillea* number two.

A review of the cases touching on the subject convinces me of the soundness of Judge Aldrich's conclusions in Pichirilo v. Guzman, 290 F.2d 812 (1st Cir. 1961),[4] and I adopt his reasons as my own, with the exception of his conclusion that the second *Grillea* modifies, if it does not destroy, the effect of the first *Grillea*. I do not believe the decision in F/V Snoopy, 1967 AMC 1078 (D.Maine, 1966), is of importance on this problem.

The facts, as I have found them, require a conclusion that the barge cannot be held liable for its unseaworthy condition which was caused solely and only by the negligence of Matson and/or the stevedore, Matson Terminals.

## ALTERNATE FINDINGS

(4) I have already found that neither the petitioner, nor the barge is liable to any of the claimants. However, the Court of Appeals might possibly hold that my findings are clearly erroneous. If, on appeal, it is concluded that the barge is liable, it would be my finding, on the evidence, that the claims of Matson Navigation Company should be denied. Petitioner's sole duty was to furnish a seaworthy barge. Cannella v. Lykes Bros. S. S. Co., supra; The Scow Joan R, 198 F.Supp. 346 (S.D.N.Y.1959).[5] The sole cause of the casualty was the negligence of Matson Terminals, Inc. To be kept in mind is the fact that Matson Navigation Company was the owner *pro hac vice* of the barge.

(5) This would not be a case in which damages should be divided between Matson Navigation Company and the petitioner.

(6) Furthermore, if my conclusions are erroneous on Point (3), I would hold that the claimants' longshoremen Wiswell and Jaschina, insofar as petitioner is concerned, could look only to the value of the barge, its equipment and pending freight. Here, I find that such liability to the longshoremen would be based on the unseaworthiness of the vessel and that such unseaworthiness arose after the demise and without the fault, privity or knowledge of petitioner. In such case, a petitioner is entitled to invoke limitation. The Scow Joan R, supra; In Re Wood's Petition, 230 F.2d 197 (2d Cir. 1956).

This opinion shall serve as my findings and conclusions. Proctor for petitioner shall prepare, serve and submit a decree in conformity herewith.

---

3. Grillea v. United States, 232 F.2d 919 (2d Cir. 1956).

4. Reversed on other grounds, 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962).

5. Rice v. New York Trap Rock Corp., 198 F.Supp. 346 (S.D.N.Y.1959).