**In the Matter of CROUNSE CORPORATION, as Owner of Barge C512.**

**TENNESSEE VALLEY AUTHORITY, Plaintiff,**

v.

**VULCAN MATERIALS COMPANY, et al., Defendants.**

**No. 94–3066–D/A.**

United States District Court,
W.D. Tennessee,
Western Division.

Feb. 20, 1997.

---

### ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' JOINT MOTION FOR SUMMARY JUDGMENT AGAINST VULCAN ON ALL LIABILITY ISSUES AND PLAINTIFFS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CROUNSE

DONALD, District Judge.

This matter is before the Court, sitting in admiralty pursuant to 28 U.S.C. § 1333, upon the joint motion of plaintiffs Tennessee Valley Authority, Entergy Services, Inc., Arkansas Power & Light Company, and Mississippi Power & Light Company (collectively, "TVA" or "Plaintiffs") for summary judgment on all liability issues against defendant, Vulcan Materials, Inc. (Vulcan), and for partial summary judgment against third-party defendant Crounse Corporation (Crounse) (Vulcan and Crounse are referred to hereinafter, collectively, as "Defendants"). Defendants op-pose Plaintiffs' motion in separate memoranda. This consolidated litigation arises out of the breakaway of a Crounse nine-barge tow from the Vulcan fleeting facility at Memphis, Tennessee, and the alleged collision between one or more of the runaway Crounse barges and a TVA tower located in the Mississippi River approximately 10 miles south (downriver) of Memphis. The case fits within the provisions of Rule 9(h) of the Federal Rules of Civil Procedure, describing admiralty and maritime claims.

As against Vulcan, Plaintiffs move for summary judgment in their favor on all liability issues on the asserted grounds that (1) Vulcan is collaterally estopped by the fact-findings of a Coast Guard adjudication from denying that negligence on its part was a proximate cause of the breakaway and the damage to the tower, (2) no fault or assumption of risk can be attributed to TVA based on the location or strength of the tower or the absence of any upstream protective devices designed to protect the tower from runaway barges, and (3) under the doctrine of joint and several liability, Plaintiffs are entitled to recover their full legal damages from Vulcan regardless of whether other tortfeasors (e.g., Crounse) were also at fault.

As against Crounse, Plaintiffs move for summary judgment on the issue of whether any fault or assumption of risk can be attributed to TVA based on the location or strength of the tower or the absence of any upstream protective devices designed to protect the tower from runaway barges.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). When read in conjunction with FED.R.CIV.P. 56(a), subsection (d) allows the claimant to seek partial summary judgment on "the extent to which the amount of damages or other relief is not in controversy." FED.R.CIV.P. 56(d). Partial summary judgment is appropriate to isolate and dispose of factually unsupported claims or defenses, and FED.R.CIV.P. 56

should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party moving for summary judgment "bears the burden of clearly and convincingly establishing the nonexistence of any genuine issue of material fact, and the evidence as well as all inferences therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.,* 799 F.2d 1128, 1133 (6th Cir.1986). The burden on the party moving for summary judgment may be discharged by pointing out that "there is an absence of evidence to support the nonmoving party's case." *Kauffman v. Allied Signal, Inc., Autolite Div.,* 970 F.2d 178, 182 (6th Cir.), *cert. denied,* 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992) (the moving party need not support its motion with affidavits or other similar materials "negating" the opponent's claim) (citing *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553). The Court may also consider any material that would be admissible or usable at trial, including exhibits that have been properly made a part of an affidavit. 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2d § 2721, at 40, § 2722, at 56 (2d ed. 1983).

When confronted with a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if the evidence is such that a reasonable trier of fact could return a verdict for the nonmoving party. *Id.* The party opposing the motion must "do more than simply show that there is some meta-physical doubt as to the material facts." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). In short, the nonmoving party may not oppose a properly supported motion for summary judgment by mere reliance on the pleadings. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. "[I]n the 'new era' of summary judgments that has evolved from

the teachings of the Supreme Court in *Anderson, Celotex* and *Matsushita,* trial courts have been afforded considerably more discretion in evaluating the weight of the nonmoving party's evidence." *Cox v. Kentucky Dep't of Transp.,* 53 F.3d 146, 150 (6th Cir.1995). "If the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the nonmoving party, the motion must be granted." *Id.*

For the limited purpose of this summary judgment determination, the Court considers the following facts. On the morning of December 24, 1992, the Crounse tug M/V HAZEL delivered nine Crounse barges loaded with crushed rock to the Vulcan fleeting facility, immediately upriver of the Vulcan material yard, between mile points 733 and 734 on the Lower Mississippi River, where Vulcan maintained wire cables and soft line for use in tying off barges. The crew of the HAZEL moored its tow to the left descending bank. On December 25, 1992, at approximately 4:00 a.m., the Vulcan towboat M/V VALERIE J inspected the Crounse barges. It is disputed whether, during their inspection of the Crounse tow, the VALERIE's two-person crew materially changed the moorings holding the barges to the bank. When the VALERIE left, sometime before 5:00 a.m., the barges were still in substantially the same position on the river.

Shortly after midnight on December 26, 1992, several Crounse barges were sighted drifting downriver of the Vulcan fleeting facility. A rescue operation resulted in the recovery of eight of the nine Crounse barges. The ninth Crounse barge (the C512) was not recovered in the rescue operation.

In February of 1993, TVA maintenance personnel visited Tower 174, at mile point 724.6 of the Lower Mississippi River, to replace warning lights. During their expedition, the TVA employees realized that something was not right with the tower. Upon climbing the tower, the employees noticed extensive damage to several of its steel members. In addition, they found the warning light system inoperable and not immediately reparable. A further inspection of Tower 174 revealed extensive damage to the tower. The top of the northwest caisson, one of four

steel reinforced concrete caissons supporting the tower, was displaced to the southeast by approximately 3½ feet. Additional damage to the steel tower atop the caissons was found present to a height of 90 feet above the waterline. Shortly thereafter, searchers located the C512 under the northwest caisson of Tower 174.[1]

Tower 174 was built in 1931 by Memphis Power & Light Company, as part of an overhead wire crossing, and stood then on the east side of the Mississippi River. The design allowed for the anticipated change in course of the river. The original permit for Tower 174, issued by the Secretary of War on December 31, 1930, allowed the construction of "an overhead transmission line supported by towers on river banks ... crossing the Mississippi River ...".

By 1946, a general alluvial widening and shift eastward in the vicinity of the crossing rendered the crossing an obstruction and threat to navigation. The War Department ordered Memphis Power & Light Company to remove the overhead transmission line by January 1, 1950, later extending the time to July 1, 1951. TVA acquired the crossing during the interim and petitioned for revocation of the 1946 order of removal. The Department of the Army (successor to the Department of War) revoked the prior order of removal, conditioned upon TVA's timely implementation of two corrective measures, to-wit: 1) construction of a dead-end structure east of the then-existing anchor structure; and, 2) removal of the two lower conductors. In addition TVA was required to submit plans for permanent alterations to the cross-

ing, for approval by the Army Corps of Engineers (ACOE). The original permit was restored to full force and effect. During the 1950's, the ACOE redirected the main navigational channel from the west side of the tower to the east side, surrounding the tower with water.[2] In 1964, TVA modified the crossing to carry a larger, single 500 kV line.[3]

A runaway barge struck the northeast caisson of the tower in 1984, displacing it at its top approximately 13 inches to the southeast and causing considerable damage to lower portions of the tower. Efforts to correct the 1984 displacement failed, and TVA instead modified the lower steelworks to restore symmetry to the tower. In late 1991, TVA undertook to renovate portions of Tower 174.

Following the collision giving rise to the instant matter, the Coast Guard charged Vulcan with operating a vessel in a negligent manner[4] and convened a hearing[5] pursuant to 33 C.F.R. § 1.07.[6] It is undisputed that a proceeding brought under 33 C.F.R. § 1.07 does not require an "on the record" hearing within the meaning of the Administrative Proceedings Act (APA).[7] It is undisputed that the party charged with a violation of 46 U.S.C. § 2302(a) does not have the right to cross-examine the Coast Guard officer who prepared the investigation report. Furthermore, it is undisputed that, pursuant to 33 C.F.R. § 1.07–55(d), the Civil Penalty Hearing Officer in a § 107 proceeding is not bound by strict rules of evidence. Following this proceeding, held on August 2, 1994, the Hearing Officer found Vulcan responsible un-

---

1. TVA first became aware of damage to the Tower 174 in February, 1993. Immediately thereafter, the United States Coast Guard located a sunken barge at the base of the tower, abutting the northern caissons. Divers were able to tentatively identify the submerged object as being of the same make and size as a typical Crounse barge; however, due to the murky water and dangerous current of the Mississippi River, the divers were unable to positively identify the sunken barge as the missing C512. A subsequent effort to raise the sunken barge in October of 1996 confirmed the Plaintiffs' allegations. The parties no longer dispute that the sunken barge at the base of Tower 174 was the C512.

2. Due to subsequent alluvial shifts, Tower 174 sat approximately in the middle of the river, adja-

cent to a major shipping channel, at the time of the accident.

3. Originally, the crossing was designed to carry two 110 kV lines.

4. 42 U.S.C. § 2302(a).

5. Penalty Case No. MV93002642.

6. Statutory authorization is found at 46 U.S.C. § 2107.

7. *See* legislative history of 46 U.S.C. § 2107, Pub.L. No. 98–89, Aug. 26, 1983, 97 Stat. 506.

der 46 U.S.C. § 2302 and assessed a penalty of $4,500.00.[8] Vulcan appealed to the Commandant of the Coast Guard, but the assessment stood.

After becoming apprised of the damage to its tower, TVA commissioned no fewer than two independent studies to evaluate the structural integrity of Tower 174 and to suggest corrective measures. After an assessment of its options, TVA decided to re-route the crossing to eliminate the necessity of having a tower in the middle of the river. A new crossing was completed in 1995, approximately five miles south of the old crossing, and Tower 174 was demolished in the autumn of 1996.

The Court addresses first the portion of TVA's motion to collaterally estop Vulcan from denying that it was negligent and that its negligence was a proximate cause of the breakaway. TVA asserts that the final adjudication of the Coast Guard in Penalty Case No. MV93002642 conclusively establishes that negligence on Vulcan's part proximately caused the breakaway and damage to Tower 174.

Prior to determining TVA's collateral estoppel motion on the merits, the Court must decide whether TVA be equitably estopped from asserting its collateral estoppel argument over 1½ years after being served with all documents relative to the Coast Guard hearing. Vulcan alleges that since the May 9, 1995 date of its initial disclosures pursuant to Fed.R.Civ.P. 26(a)(1)(B), TVA has compelled Vulcan to respond to numerous and extensive discovery requests relating to the issue of liability. Second, Vulcan suggests that because six weeks intervened between the day TVA raised and identified the C512 and the day it filed the instant motion raising collateral estoppel (October 5 and November 25, respectively, of 1996), "[t]his is clearly not a 'timely' raising of this affirmative defense." Vulcan's Memorandum In Response To Plaintiffs' Motion For Partial Summary Judgment On Liability Issues, page 7. Finally, Vulcan posits that TVA's failure to raise a "claim precluding argument" at the forefront of this litigation should operate as waiver of an affirmative defense.

TVA maintains that it could not bring the summary judgment motions until establishing conclusively that the wreck at the base of Tower 174 was, in fact, the C512, because a genuine issue of material fact concerning the identity of the crushed barge would be present, given Defendants' steadfast refusal to admit that the sunken barge under Tower 174 was the C512. TVA only managed to have the barge raised and positively identified on October 5, 1996. As to the latter two of Vulcan's responses—that TVA was untimely in its motion or that failure to bring a "claim precluding defense" at the beginning of this litigation operates as a waiver of an affirmative defense—Plaintiffs note that they are, in fact, not defendants to a Vulcan complaint. To TVA, provisions relating to the waiver of an affirmative defense are inapplicable, because TVA moves the Court for offensive collateral estoppel.

The Court agrees with TVA—Vulcan's attempts to persuade the Court to equitably estop Plaintiffs' assertion of collateral estoppel are not based on any recognized law. It does not appear to the Court that Vulcan would be unfairly prejudiced or that inequity would flow from considering TVA's collateral estoppel motion. Therefore, the Court considers whether the doctrine of offensive collateral estoppel should bar Vulcan from denying that negligence on its part was a proximate cause of the breakaway and damage to Tower 174.

■ Plaintiffs base their collateral estoppel argument on the determinations of the Coast Guard Hearing Officer in Penalty Case No. MV93002642, noting first *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), the leading case on the use of offensive collateral estoppel. According to *Parklane*, "the offensive use of collateral estoppel occurs when the plaintiff

---

8. The $4,500.00 penalty represents a $500.00 assessment for each of the nine barges involved in the breakaway. Prior to the August 2 hearing, the Coast Guard sent Vulcan a preliminary assessment of $9,000.00 (representing the maximum civil penalty of $1,000.00 per barge), 42 U.S.C. § 2302(a). Reasons for the mitigation were given as prior violation history, economic factors, quick response efforts, and improvements to prevent future incidents.

seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party." 439 U.S. at 326, note 4; 99 S.Ct. at 649, note 4. Plaintiffs list four criteria weighing in favor of applying offensive collateral estoppel in this matter:

(1) Plaintiffs could not have easily joined the earlier proceeding.

(2) Defendant had every incentive to litigate the earlier action fully and vigorously because damages at stake in the earlier action were not nominal.

(3) The judgment in the earlier action was not inconsistent with any previous decision.

(4) There were no procedural opportunities available in the second action that were not available in the first action that might be likely to cause a different result.

See *Parklane*, 439 U.S. at 329–32, 99 S.Ct. at 651–52.

■ Next, Plaintiffs rely on the benchmark Supreme Court decision for giving collateral estoppel effect to prior administrative proceedings, *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). In *Utah*, the issue most pertinent to this case involved whether to accord *res judicata* effect to the determination of the Advisory Board of Contract Appeals on a contract dispute between the United States and a contractor. The Supreme Court held that, because the administrative agency was acting in a judicial capacity and resolved disputed issues of fact properly before it which the parties had an adequate opportunity to litigate, the application of collateral estoppel was "harmonious with the general principles of collateral estoppel". *Utah*, 384 U.S. at 421, 86 S.Ct. at 1559–60.

In support of application of offensive collateral estoppel based on a prior Coast Guard administrative proceeding, Plaintiffs offer *Wentworth v. Cole*, 1990 A.M.C. 253, 1989 WL 208287 (D.Haw.1989). In *Wentworth*, the Coast Guard initiated a license revocation proceeding pursuant to 46 U.S.C. § 7703 and 46 C.F.R. § 5.501–5.577, in response to a marine casualty involving the NA PALI AD-

VENTURE. After a hearing conducted in accordance with the provisions of the APA, 5 U.S.C. §§ 551, *et seq.*, the Administrative Law Judge (ALJ) held that a charge of negligence had been proved against the boat's operator (Cole). *Wentworth*, 1990 A.M.C. at 254. When the injured parties brought suit against Cole in the district court, they argued that the court should give collateral estoppel effect to the Coast Guard determination of negligence in the prior license revocation proceeding. The district court found that the license revocation proceeding satisfied the *Parklane* and *Utah* requirements and estopped Cole from relitigating issues decided in the prior action. *Wentworth*, 1990 A.M.C. at 256.

This Court notes, however, that the Coast Guard proceeding upon which TVA founds its argument for offensive collateral estoppel was convened under the hearing procedures found at 33 U.S.C. § 1.07, not under the more stringent provisions of 46 C.F.R. § 5.501–5.577. Pursuant to § 1.07–55(d), in receiving evidence, the Hearing Officer is not bound by strict rules of evidence. Based on this and other discrepancies between procedures under 33 U.S.C. § 1.07, on the one hand, and the Federal Rules of Civil Procedure and Federal Rules of Evidence, on the other, the Court finds that the hearing procedure under 33 C.F.R. § 1.07 did not afford Vulcan the same procedural opportunities available in the instant action, and that this difference might be likely to cause a different result. *Cf. Parklane*, 439 U.S. at 331, note 15, 99 S.Ct. at 651, note 15.

The Court also notes a wide discrepancy between the damages at stake in the Coast Guard proceeding and at the amount at stake in this subsequent civil action. For nine violations of 46 U.S.C. § 2302(a), Vulcan's maximum exposure was $9,000.00. In the matter *sub judice*, Vulcan risks an adverse judgment in excess of $10,000,000.00. Under *Parklane*, the Supreme Court recognized the danger that the defendant to a prior cause of action facing small or nominal damages might have little incentive to defend vigorously in the first cause. 439 U.S. at 330, 99 S.Ct. at 651 (noting that difference between $35,000.00 in first action and $7,000,000.00 in

second action justified denying application of offensive collateral estoppel).

Moreover, in the regulations controlling investigations of marine casualties and accidents, the drafters expressly admonished that these investigations and determinations are made "for the purpose of taking appropriate measures for promoting safety of life and property at sea, **and are not intended to affix civil or criminal responsibility.**" 46 C.F.R. § 4.07–1(b) (emphasis supplied).

■ Finally, TVA asserts its argument for collateral estoppel in a motion for summary judgment. Motions for summary judgment must be founded on admissible evidence. *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990); *see* WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2d § 2721, at 40, § 2722, at 56 (2d ed. 1983). According to 46 U.S.C. § 6308:

> no part of a report of a marine casualty investigation conducted under section 6301 of this title, including findings of fact, opinions, recommendations, deliberations, or conclusions, shall be admissible as evidence or subject to discovery in any civil or administrative proceedings, other than an administrative proceeding initiated by the United States.

42 U.S.C. § 6308, Pub.L. No. 104–324, § 313 (1996). Section 6301 of Title 46 of the United States Code prescribes "immediate investigation of marine casualties." 46 U.S.C. § 6301, Pub.L. 98–89, 97 Stat. 537 (1983). A marine casualty or accident, as defined in 46 C.F.R. § 4.03–1 means "any casualty or accident involving any vessel ... upon the navigable waters of the United States ..." 46 C.F.R. 4.03–1(a). A marine casualty or accident includes "any occurrence involving a vessel which results in damage by or to the vessel ...". 46 C.F.R. 4.03–1(b). The Coast Guard hearing convened in the matter *sub judice* was held pursuant to 33 U.S.C. § 2107(a), for the purpose of assessing a civil penalty for violation of 46 U.S.C. § 2302, following the investigation of a marine casualty or accident pursuant to 46 U.S.C. § 6301. The report of the investigation pursuant to 46 U.S.C. § 6301 was admissible in the underlying administrative proceeding, because the United States brought the proceeding. 46 U.S.C. § 6301. However, that report is not admissible in this civil matter.

For the foregoing reasons, TVA is not entitled to judgment as a matter of law on the portion of its motion for summary judgment based on the prior Coast Guard proceeding. The Court declines to give collateral estoppel effect to the prior Coast Guard decision against Vulcan in Penalty Case No. MV93002642 and hereby **DENIES** TVA's motion to collaterally estop Vulcan from denying that negligence on its part was a proximate cause of the breakaway.[9]

■ In the second part of their joint motion, Plaintiffs suggest that no fault or assumption of risk can be attributed to TVA based on the location or strength of the tower or the absence of any upstream protective devices designed to protect the tower from runaway barges. TVA stresses that its ACOE permit[10] represents a determination, the legality of which this Court is not asked to review, that the tower was a reasonable obstruction to the navigable waters. *Cf.* 33 U.S.C. § 403 (1994) (Section 10 of The Rivers and Harbors Appropriation Act of 1899); *Monongahela Bridge Co. v. United States,* 216 U.S. 177, 30 S.Ct. 356, 54 L.Ed. 435 (1910).

**9.** At page 7, note 6 of the Brief of TVA and Entergy In Support of Joint Motions for Summary Judgment on Liability Issues (TVA Brief), Plaintiffs state that, even in the absence of the Coast Guard determination, Vulcan's negligence would be established as a matter of law. Plaintiffs base this suggestion on the presumption of negligence which arises in admiralty law when a moving vessel hits a stationary object. Under *The Louisiana,* 70 U.S. (3 Wall.) 164, 18 L.Ed. 85 (1865), the Supreme Court held that the moving object is presumptively at fault. *Id.* at 173. As a basis for partial summary judgment on liability issues, though, a presumption is insufficient to establish negligence when genuine issues of material fact exist. *Cf. Daughenbaugh v. Bethlehem Steel Corp., Great Lakes S.S. Div.,* 891 F.2d 1199, 1205 (issues of negligence are ordinarily not susceptible to summary adjudication).

**10.** Originally issued by the Department of War in 1930, superseded by the Department of the Army, of which the ACOE is the subdivision vested with authority to issue permits under 33 U.S.C. § 403.

In its brief, TVA asserts that it had no duty to "either (1) bear the risk of damage by an offending vessel out of control because of the negligent ... acts of the tortfeasor, or (2) expend large amounts to protect against such tortfeasors." TVA Brief, page 15, note 11. The Court notes that no party has yet been determined negligent in this matter. In prior Court orders in this case, negligence was assumed for the limited purpose of summary judgment determinations, but the Court is aware of no admission of negligence on the part of either Vulcan or Crounse, and the Court has ruled against TVA's motion for summary judgment on liability issues as to Vulcan in this order.

TVA maintains that the permit for Tower 174 forbade the construction of any impediment in the navigable waters adjacent to the tower. By the terms and strictures of the ACOE permit, TVA argues that it could not erect a protective cell upriver of the tower, even had it wanted to. Cf. *Monongahela Bridge*, 216 U.S. at 195, 30 S.Ct. at 361 (Congress, through its appropriate agent, has authority to declare what must be done to maintain free navigable waters).

Finally, TVA asserts that the rule in tort law found at RESTATEMENT (SECOND) OF TORTS § 461 (1965), that a negligent actor takes the victim as the negligent actor finds the victim, although a condition of the victim may make the injury or damage greater, applies in this case. Defendants, through their separate memoranda, do not address this portion of TVA's motion.

Vulcan and Crounse contend that the possibility of negligence on the part of TVA cannot be disposed of on summary judgment. In support of their opposition to TVA's motion, Defendants direct the Court's attention to the stream of events from 1965 to 1992, which they assert put TVA on notice that the tower was in a precarious position and that some manner of protective device was needed. The undisputed evidence shows that during January and February of 1965, TVA considered implementing a protective barrier

upriver of Tower 174. Defendants also point to events both before and after the 1984 collision, which they assert would put a reasonable person on notice that a protective device was needed for Tower 174. Defendants assert that TVA's failure to take protective measures between 1965 and 1992 was not what a reasonable actor would do under the same circumstance, and therefore constituted negligence.

Defendants offer *S.C. Loveland, Inc. v. East West Towing, Inc.*, 608 F.2d 160 (5th Cir.1979), as support for their position that TVA may be contributorily negligent, and thus not entitled to recovery of damages to the extent of its fault.[11] In *Loveland*, the court held that the plaintiff was not entitled to recover damages for any harm that the plaintiff could have avoided by the use of reasonable effort or expenditure after the commission of a tort. *Id.* at 168. In that case, the plaintiff bridge owner had notice of a runaway barge heading for the bridge, but took no affirmative measures to prevent a collision. In partial support for its decision, the court noted that contributory negligence in admiralty acts not to bar a plaintiff's claim, but to lessen the recoverable damages in proportion to all the actors' relative faults. *Id.*

TVA is correct, as a matter of law, in its assertion of immunity based on its permit issued pursuant to 33 U.S.C. § 403. In *Landowski v. Grand Trunk W.R.R. Co.*, 822 F.2d 600 (6th Cir.1987), the Court of Appeals for the Sixth Circuit addressed whether a private party complying with a federal permit issued under 33 U.S.C. § 403 has a continuing responsibility to prevent its permitted structure from becoming a navigational hazard. *Id.* at 605. The case involved a collision between a motor boat and the remnant piers of a bridge over the Saginaw River. The bridge, originally permitted in 1912 by the War Department, was razed in 1942, also by permit of the War Department. Five piers, however, were left in place. According to the court, the War Department's decision

11. "When two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degrees of their fault." *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 1715–16, 44 L.Ed.2d 251 (1975).

to allow the piers to remain in place was expressly based upon an engineer's report which opined that the remaining piers would not constitute an unreasonable obstruction to navigation.[12] *Id.*

The court in *Landowski* held that "[b]y the terms of the permit itself, it was the duty of the Secretary of War (later the Secretary of the Army) to determine whether any of the piers had become 'an unreasonable obstruction to free navigation' of the river, and then order the Railroad to carry out any alterations deemed necessary … we do not believe that the Railroad's knowledge, or lack of knowledge, is material to its claim here … it is the continuing duty of the Secretary of the Army, and not the Railroad, to prevent obstruction to navigation in the Saginaw River." *Id.* This Court is bound by the Sixth Circuit's interpretation of the insulating effect of 33 U.S.C. § 403 on liability issues. Thus, as a matter of law, TVA is immune from liability pursuant to 33 U.S.C. § 403. Insofar as Plaintiffs move the Court to find that no fault or assumption of risk can be attributed to TVA based on the location or strength of the tower or the absence of any upstream protective devices designed to protect the tower from runaway barges, that portion of the motion is hereby **GRANTED**.[13]

In the third part of Plaintiffs' joint motion for summary judgment, TVA moves the Court to declare that, under the doctrine of joint and several liability, Plaintiffs are entitled to recover their full legal damages from Vulcan regardless of whether other tortfeasors were also at fault. While agreeing that present case law allows the application of the doctrine of joint and several liability in admiralty, Vulcan contests this third portion of Plaintiffs' joint motion by noting that Vulcan has not been found liable. Vulcan asserts that the issue of whether it can be held jointly and severably liable, when no liability has been affixed, is brought prematurely and is, therefore, not properly judiciable. The Court is inclined to agree with Vulcan on this point, and therefore **DENIES** the third part of Plaintiffs' joint motion.

In sum, the Court: (1) **DENIES** Plaintiffs' joint motion to collaterally estop Vulcan from denying that negligence on its part was a proximate cause of the breakaway and collision with the tower, (2) **GRANTS** Plaintiffs' joint motion to find, as a matter of law, that no fault or assumption of risk can be attributed to TVA based on the location or strength of the tower or the absence of any upstream protective devices designed to protect the tower from runaway barges, and, (3) **DENIES** Plaintiffs' joint motion to declare that, under the doctrine of joint and several liability, Plaintiffs are entitled to recover their full legal damages from Vulcan regardless of whether other tortfeasors were also at fault.

---

**12.** In *Landowski,* the court recited *in toto* subsections (f) and (h) of the War Department permit. Those subsections reflect *verbatim* the language of subsections (f) and (g) of the permit issued for Tower 174.

**13.** This grant of summary judgment extends to the second subpart of the part of Plaintiffs' joint motions, in which subpart TVA claims that the tortfeasor must take the victim as the tortfeasor finds the victim, although a condition of that victim may make the injury or damage greater.